# United States Court of Appeals
## For the First Circuit

No. 12-1726

JONATHAN SHAFMASTER AND CAROL SHAFMASTER,

Plaintiffs, Appellants,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Howard, Circuit Judges.

James E. Higgins for appellants.
Joan I. Oppenheimer, Tax Division, Department of Justice, with whom Kathryn Keneally, Assistant Attorney General, Ivan C. Dale, Tax Division, Department of Justice, and John P. Kacavas, United States Attorney, were on brief, for appellee.

February 11, 2013

**LYNCH**, **Chief Judge**.    Plaintiffs Jonathan and Carol Shafmaster, once a married couple and now divorced, appeal from the United States District Court for the District of New Hampshire's grant of summary judgment to the United States on the plaintiffs' claim for refund of a failure-to-pay penalty imposed on them by the Internal Revenue Service (IRS).

The Shafmasters argue that there was at least a dispute of material fact as to whether the IRS was equitably estopped from assessing this fee, whether they had reasonable cause not to pay the relevant taxes within the time provided by statute, and whether the IRS had ever provided them with proper notice and demand for payment.  We affirm, and reject the attempt to get us to recognize the doctrine of equitable estoppel against the IRS by tax-owing taxpayers who do not come close to satisfying equitable principles.

I.

A.  Factual Background

This dispute about the payment of penalties arises out of the Shafmasters' underlying joint personal income tax liability for the tax year 1994.  The IRS audited the Shafmasters for 1994, as well as for tax years 1993 and 1995-1998, eventually calculating deficiencies and penalties totaling $14,367,234.[1]  In 1998 and 1999, the Shafmasters brought petitions in Tax Court challenging

---

[1] This total also included adjustments to the tax liability of various entities owned by the Shafmasters and to a personal tax return for Jonathan Shafmaster's daughter.

the adjustments for 1993, 1994, and 1995.  The IRS referred those years to its office in Portsmouth, New Hampshire, where the case was assigned to an agent named Robert Hamilton.

On March 19, 2001, the Shafmasters and the IRS entered into three limited stipulations of settlement for the years 1993-1995, which were entered by the Tax Court on April 25, 2001.  The Tax Court order for 1994 stated that the Shafmasters owed a penalty for failing to timely file a return, but it was silent on the separate penalty provision that would have addressed whether the Shafmasters would owe a penalty if they did not pay the required amounts within the prescribed statutory period of time after notice and demand for payment (a "failure-to-pay" penalty, see 26 U.S.C. § 6651(a)(3)).

Meanwhile, the Shafmasters had also filed an administrative appeal relating to the adjustments for tax years 1996, 1997, and 1998.  Those years were also referred to Hamilton and had not yet been resolved at the time of the 2001 stipulations.  The Shafmasters took the position that net operating loss carrybacks from 1996-1998 would offset much, if not all, of their 1993 and 1994 tax liabilities.

In the summer and fall of 2001, the Shafmasters' attorney had discussions with Hamilton and another IRS agent about obtaining a stay of collection.  This stay would suppress the accrual of a failure-to-pay penalty for six months.  In the district court and

-3-

in this appeal, the Shafmasters have represented that these discussions also included an offer by Hamilton to waive the failure-to-pay penalty permanently; the government denies that the evidence supports the claim that Hamilton said any such thing or that he had any authority to do so. On September 6, 2001, the parties agreed to a six-month stay of collection.

On September 10, 2001, the IRS created a Form 3552 for the Shafmasters' account, which included a "Statutory Notice of Balance Due" reflecting the 1994 tax liability. The parties dispute whether this form ever reached the taxpayers or whether it was re-routed to the Boston IRS appeals office. The Shafmasters argue that, in any event, the agreed-upon six-month stay of collection should have prevented the issuance of any Notice of Balance Due.

The Shafmasters and Hamilton continued to negotiate the assessments for 1996-1998 during the rest of 2001 and 2002. On October 7, 2002, the IRS sent the Shafmasters a Notice of Tax Lien based on the 1993 and 1994 taxes. The lien notice stated, in relevant part: "[W]e are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid." It also stated that the "IRS will continue to charge penalty and interest until you satisfy the amount you owe." The Shafmasters did not make any payments in

response to this notice. They say they did not because they believed that the amounts owed for 1993 and 1994 would be reduced due to the carryback issue and thus that the amount reflected in the lien notice was overstated.

The Shafmasters' amended returns for 1993 and 1994 were processed in December 2003, at which point the IRS determined that the 1994 liability should be reduced by $177,769 due to the carryback losses. The scope of that determination was reduced to writing, and in December 2003 and January 2004, the Shafmasters and Kathleen Brown, a supervising agent in the Portsmouth IRS office, executed a Form 870-AD that reflected the downward carryback loss adjustments to tax years 1992, 1993, and 1994. The Form 870-AD is, however, notably silent as to the imposition or waiver of any failure-to-pay penalty.

In August 2004, Jonathan Shafmaster signed an installment payment plan agreement pursuant to the Form 870-AD for the 1993 and 1994 tax liabilities, which at that point totaled over $2.6 million. Significantly, the installment plan document, Form 433-D, provided that the taxpayers "agree to pay the federal taxes shown above, plus penalties and interest provided by law" (emphasis omitted).

In March 2005, after the Shafmasters objected to certain penalties that appeared on their IRS account transcript, Brown sent Jonathan Shafmaster a letter in which she agreed to abate a

failure-to-pay penalty that had been assessed on the 1993 taxes, concluding that it had been a "calculation error."  Brown's letter went on to state explicitly: "However, the failure to pay tax penalty will continue to accrue on any unpaid tax balance until either the penalty reaches 25% or the account is full [sic] paid" (emphasis omitted).[2]

On April 17, 2006, the IRS assessed the failure-to-pay penalty at issue in this case, in the amount of $261,189.50. According to the IRS's calculations, the maximum statutory penalty for 1994 had accrued by that date.  That same day, the IRS sent the Shafmasters an updated Statutory Notice of Balance Due.

The Shafmasters completed payment of their agreed 1994 tax liability under the payment plan on November 16, 2007.  On September 18, 2008, they filed an administrative claim for, inter alia, refund of the 1994 failure-to-pay penalty and the interest they had paid on that penalty.  The IRS denied the claim on November 28, 2008.

B.  District Court Proceedings

The Shafmasters filed suit in the district court on July 15, 2009.  They argued that Hamilton had orally agreed that the IRS

---

[2] The 25% figure is a reference to 26 U.S.C. § 6651(a)(3), which provides that a failure-to-pay penalty accrues at the rate of "0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate."

would permanently waive any failure-to-pay penalties, and that this agreement was implicitly incorporated into the Tax Court stipulations, the Form 870-AD, and the installment plan. They contended that this agreement equitably estopped the IRS from assessing the penalty. They further argued that, under the penalty statute, they had "reasonable cause" to not make timely payment, see 26 U.S.C. § 6651(a)(3), because they had relied on the alleged agreement.[3]

The government moved for summary judgment, arguing that in the absence of a written agreement to waive the penalty, made using the statutory closing mechanisms of 26 U.S.C. §§ 7121-7122, the IRS could not be held to any alleged promise. In response to this motion, the Shafmasters introduced an argument not made in their complaint: that they had never received proper notice and demand to trigger accrual of the penalty.

On September 30, 2011, the district court granted the government summary judgment on the equitable estoppel and reasonable cause claims. It held that because none of the statements cited by the Shafmasters conformed to the statutory closing procedures, the Shafmasters could not have reasonably relied on those statements, thus negating an essential element of

---

[3] In addition to the claim for refund of the failure-to-pay penalty, the Shafmasters' complaint in the district court also sought refund of certain interest payments. The plaintiffs have not appealed the portion of the district court's decision that dismissed the interest claim for lack of jurisdiction.

an estoppel claim. It also rejected the "reasonable cause" argument as merely an "attempt to repackage" the equitable estoppel argument. However, the district court concluded that there was a genuine issue of material fact with regard to the notice and demand question, because the Shafmasters had produced a document from the Boston IRS appeals office indicating that notice may not have been delivered to the Shafmasters' last known address, as required by statute.

The government again moved for summary judgment on November 23, 2011, producing another part of the Form 3552 that it argued could show proper notice and demand. The district court denied this motion, finding that the document did not explicitly demand payment and did not show that it was sent to the Shafmasters. But the court noted in its memorandum denying the motion that the Notice of Tax Lien dated October 7, 2002, which was undisputedly sent to the Shafmasters, "may well satisfy the notice and demand requirement," if the government could make a developed argument on that point.

Accordingly, the government filed a third summary judgment motion on February 16, 2012, arguing that the Notice of Tax Lien provided satisfactory notice and demand. On May 7, 2012, the district court allowed this motion, resulting in judgment for the government on all claims. The Shafmasters timely appealed.

II.

Our review of the district court's grant of summary judgment is de novo, "drawing all reasonable inferences in favor of the non-moving party while ignoring 'conclusory allegations, improbable inferences, and unsupported speculation.'" Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009) (quoting Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009)). We may affirm on any basis apparent in the record. Id.

In tax refund suits, the decision of the IRS Commissioner enjoys a presumption of correctness, so the taxpayer bears the burden of proving that an assessment was erroneous. Hostar Marine Transp. Sys., Inc. v. United States, 592 F.3d 202, 208 (1st Cir. 2010).

The Internal Revenue Code's failure-to-pay penalty provision, at issue here, provides that if a taxpayer fails

> to pay any amount in respect of any tax required to be shown on a return . . . which is not so shown . . . within 21 calendar days from the date of notice and demand therefor (10 business days if the amount for which such notice and demand is made equals or exceeds $100,000), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount of tax stated in such notice and demand 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

26 U.S.C. § 6651(a)(3). Because the Shafmasters' 1994 tax liability exceeded $100,000, they were subject to the ten-day period for payment.

A. Equitable Estoppel

The Shafmasters argue that the IRS was equitably estopped from assessing the failure-to-pay penalty because the agency had, through Hamilton and through the various documents that the Shafmasters signed, agreed not to assess such a penalty, and the Shafmasters had relied on that promise. The argument fails, for a number of reasons. We need not reach the question of whether equitable estoppel can ever bind the IRS in informal settlements reached apart from the §§ 7121-7122 procedures.

In Botany Worsted Mills v. United States, 278 U.S. 282 (1929), the Supreme Court interpreted the predecessor of 26 U.S.C. §§ 7121-7122 as providing the "exclusive method" for compromising tax liability, holding that Congress "did not intend to intrust the final settlement of such matters to the informal action of subordinate officials in the [IRS]." Id. at 288-89. As a result, the Court concluded, informal settlements are not binding on either the taxpayer or the government. Id. at 288. However, the Court went on to note that it was not "determining whether such an agreement, though not binding in itself, may when executed become, under some circumstances, binding on the parties by estoppel." Id. at 289. The Court thus left the door open for the argument that

-10-

some informal agreements between taxpayers and the IRS might give rise to claims of estoppel -- at least when, as in Botany Worsted, the government asserts estoppel against a taxpayer.

In the years since Botany Worsted, a number of courts of appeals have determined that informal settlements such as the Form 870-AD can in fact trigger estoppel against taxpayers, although there is disagreement as to when, if ever, estoppel may apply. See Whitney v. United States, 826 F.2d 896, 897-98 (9th Cir. 1987) (collecting cases). It does not appear that any circuit has used an informal tax settlement to bind the government under estoppel principles, although it also appears that the question simply may never have been addressed.[4]

The First Circuit has not decided whether informal tax settlements can be binding by estoppel even on taxpayers, and we need not do so now in order to resolve this case. Nor do we need to determine the relationship between claims of estoppel and the statutory closing mechanisms of 26 U.S.C. §§ 7121-7122. Even assuming arguendo that an informal IRS settlement such as the Form 870-AD could ever have estoppel effects against the government -- a proposition of which we are skeptical -- the Shafmasters'

---

[4] One unpublished table decision from the Seventh Circuit did mention the issue, and it rejected estoppel against the government based on reasoning similar to that used by the district court in this case. See Meyers v. Comm'r of Internal Revenue, No. 95-1542, 1996 WL 116818, at *2 (7th Cir. Mar. 13, 1996).

-11-

argument would fail.  There is no viable claim here in any event under general principles of equitable estoppel.

Generally, in order to make out a claim for equitable estoppel, a party must show that "(1) the party to be estopped made a 'definite misrepresentation of fact to another person having reason to believe that the other [would] rely upon it'; (2) the party seeking estoppel relied on the misrepresentations to its detriment; and (3) the 'reliance [was] reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.'" Ramírez-Carlo v. United States, 496 F.3d 41, 49 (1st Cir. 2007) (alterations in original) (quoting Heckler v. Cmty. Health Servs., 467 U.S. 51, 59 (1984)). Additionally, when a party seeks to equitably estop the government, it "must show that the government engaged in affirmative misconduct." Id. Although "there is no settled test for what constitutes" affirmative misconduct, it must at least include "an affirmative misrepresentation or affirmative concealment of a material fact by the government." Id. (quoting Watkins v. U.S. Army, 875 F.2d 699, 707 (9th Cir. 1989)).

Here, the Shafmasters did not present a genuine issue of material fact as to whether a government actor engaged in affirmative misconduct.  In fact, the Shafmasters do not even allege that Hamilton, Brown, or any other representative of the IRS did engage in misconduct during the Shafmasters' negotiations or

-12-

when executing the various documents. Instead they argue, erroneously, that this circuit's case law should be read to excuse the misconduct requirement and instead to apply a "balancing approach" that would weigh the interests of the party asserting estoppel against the public interest represented by the underlying policy at issue. This is a misunderstanding of our precedent. Indeed, we recently reaffirmed the principle that the affirmative misconduct requirement applies in this context. See Dickow v. United States, 654 F.3d 144, 152 (1st Cir. 2011) ("The argument of estoppel by silence on the part of the busy IRS is, on these facts, simply a non-starter."). The Shafmasters also conflate affirmative misconduct with the separate element of misrepresentation of fact.

Further, none of the documents on which the Shafmasters rely -- the Tax Court stipulation for 1994, the Form 870-AD, or the installment payment agreement -- mention the 1994 failure-to-pay penalty at all, let alone demonstrate that the penalty was waived. To the contrary, the installment plan specifically states that the taxpayer will pay the amount shown "plus penalties and interest provided by law" (emphasis omitted). Brown's letter to Jonathan Shafmaster in March 2005 reminded him that failure-to-pay penalties were accruing on the unpaid balance. Because none of the documents promised to waive the penalty -- and some explicitly warned of the penalty -- there was no definite misrepresentation of fact contained therein as to whether the penalty would be assessed.

This disposes of any dispute over what Hamilton did or did not say. The written settlement documents made it unreasonable for the Shafmasters to continue to rely on any alleged oral promise from Hamilton.

B. <u>Reasonable Cause</u>

The IRS will not impose a failure-to-pay penalty if "it is shown that such failure is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(3). The taxpayer bears the burden of proving both reasonable cause and the absence of willful neglect. <u>United States</u> v. <u>Boyle</u>, 469 U.S. 241, 245 (1985). The Supreme Court has defined "willful neglect" as "a conscious, intentional failure or reckless indifference." <u>Id.</u> Treasury regulations provide that "reasonable cause" exists when the taxpayer has "exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date." 26 C.F.R. § 301.6651-1(c)(1). Undue hardship, in turn, means that "substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer for making payment on the due date of the amount with respect to which the extension is desired." 26 C.F.R. § 1.6161-1(b).

The Shafmasters did not argue in the district court that they were unable to pay, or would have suffered undue hardship if

they had attempted to pay, the 1994 tax liability within ten days of receiving notice and demand, as required to prevent accrual of the penalty.  See 26 U.S.C. § 6651(a)(3); 26 C.F.R. § 301.6651-1(c)(1).  The Shafmasters cannot assert for the first time on appeal that there was a triable issue as to undue hardship when they bore the burden of presenting evidence to the district court that would have demonstrated such hardship.  The issue is waived.  See Cochran v. Quest Software, Inc., 328 F.3d 1, 11 (1st Cir. 2003).  Since the Shafmasters did not show inability to pay or undue hardship, they cannot seek refuge in the "reasonable cause" exception.

Moreover, the Shafmasters have never argued that their failure to pay within the statutory time frame was anything but intentional.  Instead, they argue that they had "reasonable cause" to intentionally delay payment because they were negotiating with the IRS at the time and anticipated that the 1994 liability would ultimately be reduced by loss carrybacks.  The district court correctly found that this argument is essentially a "repackag[ing]" of the equitable estoppel claim: the Shafmasters again attempt to defeat the penalty by asserting a reliance interest in alleged promises from the local IRS officer.  Yet none of the settlement documents reflect a commitment by the IRS to delaying assessment or collection of the 1994 taxes until all of the loss carryback issues

-15-

were resolved.  The 1994 penalty was assessed outside the agreed-upon six-month stay period.

C.  Notice and Demand

The Shafmasters argue on appeal, as they did before the district court, that the October 2002 Notice of Tax Lien did not constitute sufficient notice and demand because it stated an incorrect amount, did not explicitly "demand" payment, and was sent too late.  They also renew their argument that the April 2006 assessment did not properly "relate back" to the Notice of Tax Lien.  Like the district court, we reject these arguments.[5]

> Under 26 U.S.C. § 6303(a), the IRS
>
> shall, as soon as practicable, and within 60 days, after the making of an assessment of a tax pursuant to section 6203, give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof. Such notice shall be left at the dwelling or usual place of business of such person, or shall be sent by mail to such person's last known address.

This provision does not require the IRS to use any specific form of notice.  See United States v. Roccio, 981 F.2d 587, 591 (1st Cir. 1992).  Although the statute instructs the agency to give notice

---

[5] The government argues on appeal that the district court erred in finding that there was a genuine issue of material fact as to whether the IRS gave notice and demand on September 10, 2001. Because we can resolve the Shafmasters' notice and demand claim based on the October 7, 2002 Notice of Tax Lien, we need not address this point.

and demand within sixty days of assessment, lateness alone is not grounds to invalidate the notice. 26 C.F.R. § 301.6303-1(a).

As to the argument that the Notice of Tax Lien reflected an inaccurate amount, the Shafmasters contend that because the carryback losses had not yet been applied to their 1994 tax liability as of the date of the Notice of Tax Lien, that notice could not have been correct because it did not state the true amount they owed the IRS.[6] The Shafmasters do not offer any case law or regulations to support the proposition that an assessment is "inaccurate" because there is a chance that a taxpayer's liability may change at a later date, even though the assessment is accurately calculated as of the date it is made. Further, they distort the record when they argue that as of October 2002, "there was a concrete understanding between the IRS and taxpayer[s]" that the 1994 liability was lower than the amount reflected on the lien notice. While there were negotiations and calculations ongoing throughout 2002 and 2003, the IRS did not make any "concrete" determination that carryback losses would reduce the 1994 tax liability until it prepared the Form 870-AD in December 2003.

A taxpayer cannot refuse to pay an assessment following notice and demand on the mere assertion and belief that he might be able to apply carrybacks at a later date, and then avoid the

---

[6] The Shafmasters argued in the district court that there was a calculation error in addition to the loss carryback issue. They do not press that claim on appeal.

-17-

penalty for failing to timely pay.  See, e.g., Simon v. Comm'r of Internal Revenue, 248 F.2d 869, 877 (8th Cir. 1957) ("The carryback provision does not relieve the taxpayer of the obligation to pay the tax in full when it falls due, and can not be interpreted as deferring taxpayer's duty to pay the tax promptly."); Rev. Rul. 72-484, 1972-2 C.B. 638 ("Even though a carryback of a net operating loss eliminates the tax for a given year, penalties incurred for failure to file a return and pay the tax for that year within the prescribed time are not affected by the carryback."); cf. Manning v. Seeley Tube & Box Co. of N.J., 338 U.S. 561, 565-66 (1950) (holding that "[t]he subsequent cancellation of the duty to pay" a deficiency due to carryback adjustments "does not cancel in like manner the duty to pay the interest on that deficiency," because "[t]he fact that the statute permits the taxpayer subsequently to avoid the payment of that debt in no way indicates that the taxpayer is to derive the benefits of the funds for the intervening period").  We reject the Shafmasters' argument to the contrary.

With regard to the "relation back" issue, the Shafmasters argue that, if October 7, 2002 was the date of notice and demand, then the full penalty would not have accrued by April 17, 2006, the date of the penalty assessment.  The district court concluded, and the government concedes in its briefing before us, that the IRS had based its accrual calculation on having sent notice in September 2001, not October 2002.  Although the district court found that the

-18-

government had not shown that proper notice was actually sent in September 2001, the court ruled that the Shafmasters' argument failed nonetheless, because the Shafmasters did not actually pay their 1994 taxes in full until November 2007, almost a year after the full penalty would have accrued based on a notice date of October 2002.

Neither the plaintiffs nor the government have provided us with circuit court or regulatory authority governing the effect of a premature penalty assessment.[7] In this particular factual situation, however, we agree with the district court that the Shafmasters have shown no plausible basis for invalidating the penalty based on its timing. The full penalty would have accrued by the time the Shafmasters finished paying their 1994 taxes, and they have made no argument and provided no evidence that they would have paid their taxes earlier if they had known that the full penalty would accrue on a later date. To the contrary, the evidence shows that the Shafmasters had ample warning that they would be subject to a failure-to-pay penalty -- at the least, via the 2002 Notice of Tax Lien, the installment payment plan, and the

---

[7] The government cites several district court decisions stating that failure-to-pay penalties do not have to be separately assessed, but these cases all addressed the timing of penalties vis-à-vis the statute of limitations, not the penalties' relation to the date of notice or the date of assessment. See, e.g., United States v. Lund, No. 6:12-CV-62-TC, 2012 WL 3779105, at *1 (D. Or. Aug. 31, 2012); Bob Hamric Chevrolet, Inc. v. IRS, 849 F. Supp. 500, 515 (W.D. Tex. 1994); United States v. Krasnow, 548 F. Supp. 686, 688-89 (S.D.N.Y. 1982).

2005 letter from Brown -- yet they still did not complete their payments until November 2007.

We can dispense quickly with the remaining two arguments. As noted above, sending notice and demand more than sixty days after the assessment is not grounds for invalidating the notice. 26 C.F.R. § 301.6303-1(a). And the Shafmasters' contention that the Notice of Tax Lien did not actually demand payment is belied by the plain language of the document, which "giv[es] a notice that taxes (including interest and penalties) have been assessed"; states that the IRS "ha[s] made a demand for payment of this liability, but it remains unpaid"; alerts the taxpayers that a lien has been placed on their property; and warns that the lien will not be released until the full amount is paid or bond is posted and that the IRS will "continue to charge penalty and interest until you satisfy the amount you owe." Under these circumstances, it strains credulity to argue that the Notice of Tax Lien did not "demand" payment.

### III.

The Shafmasters failed to raise a genuine issue of material fact as to any of their claims. The district court's grant of summary judgment to the United States on all claims is <u>affirmed</u>. Costs of this appeal are awarded to the IRS.